Case No. 15-4227 Michael Niyibizi v. Jefferson B Sessions III Argument not to exceed 15 minutes per side. Miss Liss, you may proceed to the appellant. May it please the court, my name is Maris Liss and I represent Michel Niyibizi and his family. Mr. Niyibizi and his wife are sitting in the front row over here. In 2006, he was working as a translator for the Department of Justice and he was sitting at the Department of Justice table with three and sometimes four lawyers, huddling with them and conferring with them during the proceedings. And one of the issues in the case, of course, is whether he had a neutral role. There was, of course, a neutral interpreter sitting near the witness box. Each side, I understand, had their own team interpreter. There are at least 11 pans that I perceive Mr. Niyibizi can prevail on and I'll hit on as many as I can. I want to start by saying that appellant courts are very deferential to demeanor findings of lower court judges. And in this case, there was a lower court judge who made a lot of findings about the demeanors of the Rwandan officials and that was the judge in the Karake District Court case. And this judge found, in particular I'll mention Officer Kavinko, who ran the torture camp in Rwanda, found him, either his testimony was impeached or unbelievable, that he exhibited intense palpable hatred towards the defendants. He denied the torture and he... Was the U.S. government prosecuting the terrorists? Yes, that's right. Wasn't Mr. Niyibizi on the side of the U.S. government, as you pointed out? If he was neutral, which is a fact finding, but assume, even if he wasn't, he was on the same side as the Rwandan government. Well, it was like a marriage that ends in divorce. Because what happened was, they started out on the same side, and then as Mr. Niyibizi translated forensics, met with doctors and witnesses, it became apparent that the defendants had been tortured, that their confessions eventually were suppressed. So even though it started out as a marriage, the Justice Department became bitter that the Rwandans had tortured the defendants, Didn't he himself say he was neutral? He's not a lawyer, and English is not his first language. He may have said that, but I don't think that means that he was neutral. The question is, how was he preserved? Is that a factual finding, that he's neutral? It was, well, the judge found, and the BIA found, I'm thinking this out in my head, that he is neutral, non-procedural, or substantive. I'm not sure if that's legal, or if that's factual. I'm hoping it's legal, because then I get to go over you. How is it legal? It's a factual finding, right? He's either on one side or the other, or he's neutral. I suppose so. But I think it's a finding that no reasonable trier of fact would find that he was neutral. And, you know, in fact, in the 2013 country report... The standard is the evidence has to compel the conclusion to the contrary, right? Absolutely, and I think that here, it does compel. For example, and by the way, that is not the only path to victory. But here, in the 2013 country report, it said that it is a crime to spread false information with the intent to create a hostile international opinion against Rwandan government. Can I ask you another question? Sure. ...particularly to his status as interpreter. Was he... Were the team interpreters sworn in, or were they merely internal interpreters for the lawyers, and so forth, and the... Any paralegals, any others? I prepared for that question. I asked Mr. Nbisi right before we started. And he said that he had to swear at the accuracy of written statements, but he was never sworn in at court proceedings or at the interviews. He wasn't given an oath. So he was not under oath to provide accurate translations, although he did swear as to some written documents. To many written documents, yes. So he was not neutral in the sense that he was the court interpreter who swore to give a fair and accurate translation. That is true. That is definitely a distinction. And, you know, he was on a side. He was on a team. The team included the Rwandans, but ultimately there was a fallout. And with the Rwandans denying that they did torture, and the federal judge, you know, finding that they were liars, and then, you know, Rwandan hostility... And he has provided the translation that led to that. Absolutely. Yes. Are there any evidence on the record that the three Rwandan officials who were at the trial are still in government in Rwanda, or are they long since departed? I believe that in my review of materials, I don't know if it's in the record or not, that they are still in power, part of the government, in Rwanda. And I can follow up on that. I just want to mention one other thing about what Judge Apar said about whether he said he was neutral. You know, there's nuances to the words. Like, when he said he was neutral, you know, meaning that he was translating what he heard and not putting spins on things, not, you know, trying to, you know, sort of twist it in a way that it was either sides, but, you know, fairly doing what he says, but, you know, not necessarily, like, being a neutral person in the courtroom in the sense that the judge or the PIA said. And then, of course, after the trial in 2013, as reported in the country report and in my briefs, it became a crime to spread false information. And, of course, we know that the Rwandans think that the fact that they tortured is false information, and it's a crime specifically to spread false information to create a hostile international environment. And this was an international incident. And as I said, you know, in my latest letter, you know, this manner is fresh. There's a manner connected to this pending in the Fourth Circuit. The Rwandan officials, you know, have given insurances to try to get the defendants back to Rwanda. They have a big shot of attorneys from big firms, Arnold & Porter, Crowell & Morgan, big CLU. And 17 amicus signs on. I mean, so there's a lot going on in this case where it's not just a distant memory of over 10 years ago. And also, he had misdued abuse. There's a big, you know, we don't have this in our country, but there's a lot of conflict or stress between Hutus and Tutsis.  There's official security documents, you know, that show that they're torturers. And he's obviously a Hutu by, you know, how he looks and how he sounds, and they knew it, and they spent time with him, and they met him, and they intimidated him. But I want to also go... And I also want to mention that our government recognizes that people who interpret are often viewed as, you know, taking sides, you know, whether they're neutral or giving fair interpretation. You know, we have a special visa for Afghans in Iraq. In 2014, 1,000 Iraqi interpreters were killed, and one Afghan interpreter was killed every 36 hours in 2014. I happen to see that, and I believe that that's what spurred, you know, the outcry that interpreters should be protected. And realizing the question is, it's kind of like social theory. How are they viewed by the people of the country? You know, you are facing a pretty... a standard of review that is a pretty tough one for a petitioner. Have you thought about this ever, trying to dispose of this case in another way through the appeal process? Well, we have... You know, this case was in advance for a while, and I was hoping that, you know, that the government would come back and decide to, you know, settle the case. But it didn't work out. Have you sought to work with the government on resolving it in another way? Yes, for months we were. I sent equity packets and, you know, prosecutorial discovery, you know, packets with numerous exhibits. For example, you know, Mr. Dibisi's son is going to his fourth year of medical school, and his daughter finished with a degree in computer science and engineering, I think. I wrote it down before the hearing. Math and computing. And, you know, he's a nurse. His wife works and is a cancer survivor. I mean, they have a lot... To be honest, there's, like, one thing in the son's past, which I think was a holdback. You know, he had a... And this is not relevant to the appeal, but I'm just going to mention it because you asked about why we haven't settled. And, you know, he had a criminal, like, arrest, but that was acquitted by a jury. And then after that, it was operating under the influence, and I think that there's sort of a position that... Was there any effort in formal mediation? Well, we haven't gone to actual mediation. I don't... But we have... I think probably the mediator put the case in the pan, so there was contact. But I would love to... I would love to settle this case. But there were actual mistakes, like... Well, hey, your time's up, and I think what the panel is interested in talking about now is efforts to resolve it outside the normal judicial process. And so if you have anything else to tell us about that, we'd love to hear it. You can be assured we're going to talk to your adversary about that, too. Okay, okay. I just... Can I say one more, like, sentence or two? There were factual errors in the board's decisions, like saying that discussion of who to ethnicity is eliminated from public discourse, and that was absolutely wrong. I mean, so there's black-and-white things where it felt compelled overturning the decision, and that's just one of them. Okay, thank you. May it please the Court, Sarah Harris for the United States. I'd like to turn first to Judge Gable's question at the end, with respect to why we're here and the status of settlement discussions. I think it's important to think about why we're here, which is Petitioner has appealed the denial of his asylum claim. The government does not have discretion to grant asylum to someone who is statutorily ineligible for it. The government would have discretion just not to proceed any further in this matter, wouldn't it? So the government... Let me be careful of how I answer that. If this court were to affirm the BIA decision, that would have the effect of lifting the stamp on removal proceedings, in which case there would be a removal order, and it is true at that point that the Department of Homeland Security would have discretion to determine how it acts to enforce that removal order. Well, ultimately, there's going to be discretion on the part of the government in terms of whether he's deported, correct? Well, I mean, the government would have discretion to figure out the timing of how to execute removal orders, but I would note that the current policy is when there is a removal order, the government does tend to execute it. It is a priority to execute them. It is true that there is discretion with respect to the timing of it. What's the... I mean, the Department of Homeland Security has a role. The Justice Department has a role. Who gets to decide, ultimately, if litigation is resolved in a particular way on behalf of the government? Well, I mean, in this case, again, the client is the Department of Homeland Security sort of proceeding with the removal order, and so... So, presumably, the Justice Department could recommend to the Department of Homeland Security a particular course of action. The department can certainly counsel what this court prefers to happen, but, again, it's ultimately... In executing orders for removal, the Department of Homeland Security is charged with that task by statute. And I would note just... I think it's also important to think about how the sort of procedural posture of this case fares upon this question. Again, this is certainly not a case in which the Department of Justice availed itself of Mr. Niagizi's services and made any sort of representation with respect to treatment. Again, Mr. Niagizi became a translator and interpreter for the department after removal proceedings had already been in place for some time and did not inform the department... So was Judge Boggs wrong in saying that the attorney general had the discretion because of the statute says may to allow him to stay in the country? So I think there may have been a misimpression with respect to what the discretion entails. It's, of course, true that asylum isn't ultimately a discretionary determination, but, as your case in L.E.B. Oshkraft, for instance, illustrates, it's sort of a two-part process. The first is determining whether someone is statutorily eligible for asylum, meaning are they someone who qualifies as a refugee. And only if that first sort of threshold barrier is clear can the attorney general or the secretary of Homeland Security under 1158B1A have discretion to ultimately decide yes, the person's eligible, but should be... So what happens when we let... I'm just curious. I don't know the answer to this. When we let interpreters, for example... I understand why he's different, but in Afghan and Iraqi interpreters, is it because we find they're subject to persecution or is it because of something else? So my understanding is there actually should be something else, which is the special... I believe there are special visa programs for those particular individuals that allow them to come into the United States. If there were an asylum claim, it would proceed under the same framework, that there would be an indication that the person does, in fact, qualify as a refugee, that they've established their requisite fear of persecution, and then after that, there's sort of a discretionary determination whether... Can I ask one more thing? So I understand that now, thank you. If we ordered removal, is he eligible for cancellation of removal? Mike, I don't think he would be in these circumstances. Again, the situation would be there is a final order of removal and there's no sort of change in circumstances that would warrant not removing him. Well, I thought the prior panel in this court decided that his work as a translator did amount to a change in circumstances, and that's why the document was remanded, right? So that it could be heard on the merits by the BIA rather than just dismissed. So I think there's two points I'd like to make on that, and I think the procedural posture, again, is really important in understanding this court's prior decision. Before this court in 2008 was a question of whether the BIA used its discretion in denying a motion to reopen based on changed country conditions. So at that point, there wasn't any sort of discussion or testimony from the petitioner that they were later taken, and the court found there wasn't use of discretion because the BIA, it said, had relied on the lack of credibility as to its past persecution claim. The court did, of course, also note things like that it thought that he might be able to establish a claim based on his role as a free leader and what the Iraqi case revealed about Rwanda. But I think it's absolutely critical to understand what happened in the disposition of that was to remand back to the BIA to take a fresh look on the merits as to whether it was going to decide or not to reopen the case. It was not sort of a finding at the appellate level that these things were present, and I think nor could the court have done so, and that's why I think my reading of the prior opinion is right. I think under the Teneri principle, had this court tried to sort of de novo make some sort of factual findings with respect to how good Mr. Neguse's claim was, there would be a problem again, because the BIA hadn't had the opportunity to look at it in the first instance. On remand, the BIA was then able to reopen proceedings and look at a much fuller record, including evaluating petitioner's testimony before the integration judge. And it reached its conclusions with respect to the lack of likely persecution after very carefully considering that record, and again, the senior judge part noted would be whether that record is supported by substantial evidence and compel a different conclusion. The government's position is that all he was doing was providing a technical support or technical role in that case, correct? Correct. And not just the government's position, I think it's important to know. I think the IG and the very careful 36-page opinion in the BIA look at this and conclude that Mr. Neguse was playing the role of someone who was faithfully translating and also interpreting what witnesses had said, and that's also consistent with his own statements at pages 700 and 270. That doesn't seem consistent with what some of the assistant United States attorneys in that case said later, that he performed a critical role, that his skills were unique. Well, I don't think there's any sort of difference between... I don't think there's any sort of tension between the two things. I think someone can perform an important technical role without faithfully using a specialized skill, for instance, a language skill, and that can be important, but it doesn't mean that the person is sort of not... Well, he's advising the government when to disagree with the official interpreter, right? Again, I think that's consistent with the idea that... And this is also what he says, I think, in the record at 700 to 704, which is his role was to faithfully translate documents. So I think whatever glass you want to put on that, I don't think there's any dispute it's important that he was able to faithfully translate documents and interpret things and know when they were... Judges sort of tend to sometimes have a bigger view of cases that come from seeing a lot of different cases and a lot of different situations. And the... Judge Sipar and I have been district judges. Judge Gilman has been on our court, the appellate court, for a long time. He's seen a lot of situations. There are all kinds of situations where the government, particularly in the criminal context, grants substantial advantage to people who have rendered substantial assistance. In a way... And also just to co-operating witnesses, in a way, the service provided by Mr Yavizzi was of a higher and better and more critical order than the sort of assistance that is granted often in criminal prosecutions, and yet he appears to have received no consideration for his efforts on behalf of the government, including what Judge Gilman identified as his unique contribution. That, to us, seems anomalous. And just before court, we were talking about the feasibility of some kind of a settlement procedure. And we would have the authority to use not only our circuit mediator, but we could go outside that, and under the rules, we could ask another judge, we could ask a district judge. I mean, we've got a lot of options in terms of seeking involvement by those other than this panel in getting this matter resolved in what would seem to be a more common sense way that takes into account all the circumstances and the practical realities. Does the government have any thoughts about that? I do think the important thing is sort of what's legally possible, right? I mean, I think there are important constraints in what the government can give. And we are in a situation where, again, we had over a year of discussions before this case was briefed. The case was held in advance. Well, sometimes people who can't get there on their own get there pretty easily with the help of somebody else from the outside who can help analyze. And it even helps... I mean, we know you can't decide to resolve this case in a way that's favorable to the petitioner. But in a way, somebody outside could facilitate getting to the ultimate decision-makers. Do you have any comment on that? I do think it would be very legally challenging. Again, it has to operate within the legal constraints of immigration law.  I mean, the government ultimately can decide simply not to pursue. If this court had ordered a final... were to affirm the BIA and enter a final order of removal, at that point, the question of process would again be on the table. But the challenge for us now is, again, Mr. Diabese is entitled to pursue his asylum claim. We can't make him give it up. And the government can't grant asylum to someone through the form of relief that he's requesting to someone who's not statutorily eligible for it. But what makes it not statutorily eligible? Again, the findings of the BIA and the immigration judge that he has not been persecuted on the basis of political opinion or his ethnicity, which, again, is the determination to which this court owes quite a good deal of deference. That's the sort of statutory issue here. I'm just curious, what do we give to people who assist the government? Because I know when I was a prosecutor, we had foreign witnesses, and I don't know whether it was the FBI or the U.S. Attorney General who did it, but we always got permission for visas and things. Can that happen in a case like this or no? Well, a visa would be an ability to enter the United States. At this point, Mr. Diabese is in the United States and he's seeking asylum because he sort of conceded back in 1999 that he was removable. And so at this point, the question is, what relief would allow him to stay in the country? And asylum is something far greater than sort of not just being removed. It confers things like witness citizenship. And so it's sort of the remedies. What if he gave that up in exchange for being able to stay? Is that even an option? What if he gave it up? I mean, again, I think the question at that point would be, is the government able to decline to execute an order of removal if that is, in fact, something that is restorative. Again, it's state right now. If the court wishes, I can proceed back to the merits. Thank you. I have a creative idea. You inspired me. I'm using my phone because I looked it up on the internet and I don't know if my heart's on it when I look at it. In terms of a creative idea, there is a special kind of visa called an S visa. Some people call it the snitch visa. And it's a visa for aliens who provide critical, reliable information necessary to investigate or prosecute criminals. And I believe there's 200 here, but if they run out, they can carry over to the next year. So how about an idea that the Justice Department looks into processing his four members of his family for that so that they can stay in a legal with a visa. It doesn't rely on discretion, which really worries me because the Detroit Immigration and Customs Office is zealous in deporting people. I even have a client whose wife is in advanced multiple sclerosis. So the point is the S visa, which is what I was referencing, but that is on the discretion of the Attorney General, correct? Yes, that's from the Justice Department. And it doesn't rely, I don't think, well, I'm not an expert, you know, because maybe the State Department's involved and the State Department is involved in the Karaki case in the Fourth Circuit because they're getting diplomatic insurances for those Karaki defendants that they won't be tortured. They could disappear, but they won't be tortured. Do you understand that the U.S.'s position is as part of that, even if that's an option, he would have to give up his asylum claim? Well, I mean, I have to talk to my client, but if this court would keep the stay of removal going while the S process is going, then he would be protected for removal because I'm telling you, if there's like a second gap, they'll go to his apartment and grab him and send him abroad. So if the stay in this court will continue while, and I don't know if the S visas are available this year or next year and how long the process takes, but I think that he really is a candidate, like a true candidate, not even like a bending over backwards candidate for this S visa, and especially with the testimonials that Judge Gilley pointed out from the lawyers he worked with, and they said that they wanted to help him, and I would hope that the stay would continue while that's going on so he doesn't get removed, and then his family would have visas to be here and then, you know, go on with their lives. It's been a very rough for them all these years. Do you have anything further? Let me just look at my notes for one second. Well, one of your first questions to the government was referencing the old circuit decision, and whether there was a change personal conditions or change country conditions, and I just want to mention, and I think Ms. Harris fairly addressed this, you know, that in AR Administrative Record 1430 the PMA gave a new decision after the PMA, and then they actually said, yes, he has pre-mufascia established a case for asylum, and so there was a split decision here, but then when it went back to the PMA, they said yes, you know, there's a pre-mufascia case, so I think that's significant. Thank you. I don't have anything else. We thank you both for your argument. We'll consider the case carefully in terms of what other alternatives there might be to help get it resolved.